# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:17-cr-00097 |
| | ) | |
| TERRENCE DEON REAMES | ) | |

## MEMORANDUM OPINION

Pending before the Court is Terrence Deon Reames' Supplemental Motion for Compassionate Release under the First Step Act, 18 U.S.C. § 3582(c). (Doc. No. 63). That Motion has been fully briefed by the parties (Doc. Nos. 65, 66, 71, 72) and, for the reasons that follow, will be denied.

## I. Background

On May 24, 2017, a federal grand jury returned a three-count Indictment against Reames. Count One charged that, from approximately May 2011 to August 2014, Reames engaged in a continuing criminal enterprise by committing a number of violations of the Controlled Substances Act, 21 U.S.C. § 801, *et seq*. Those violations included: (1) possessing with intent to distribute and distributing controlled substances; (2) using a communication facility in committing a drug felony; (3) attempting to possess controlled substances with the intent to distribute; (4) investing illicit drug profits; (5) using a place for the purpose of manufacturing, distributing, or using a controlled substance; and (6) importing controlled substances. Count One also alleged that Reames was an organizer or leader of this continuing criminal enterprise, and that he obtained substantial income and resources from it. Count Two charged Reames with Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h), while Count Three charged him with knowingly possessing firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c).

On February 22, 2018, Reames pled guilty to Counts One and Two of the Indictment, pursuant to a binding Rule 11(c)(1)(C) plea agreement. The Court accepted the plea agreement and Reames was sentenced to an agreed-upon 20-year term of imprisonment on January 4, 2019.

Reames is incarcerated in the low-security federal correction institution at Forrest City, Arkansas ("Forrest City-Low"). On June 7, 2020, he submitted a request for compassionate release to the warden of that facility, (Doc. No. 70-1), but has received no response. Reames is not scheduled to be released from the custody of the federal Bureau of Prisons ("BOP") until July 7, 2034.

## II. Statutory Framework

So far as relevant, the First Step Act provides that a court, "upon motion of the defendant . . . may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(I). Section 1B.1.13 and its application notes identify three categories where "extraordinary and compelling" circumstances may be found to exist, including the medical condition of the defendant.

With regard to a medical condition, the application notes specify that compassionate release can be appropriate where:

> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is –

2

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, comment n. 1(A)-(C). Additionally, the application notes contains a catch-all provision that provides:

> (D) Other Reasons. – As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Id., comment note (D).

Notably, the catch-all provision is different from the three other specific provisions because it is prefaced with the phrase, "as determined by the Director of the Bureau of Prisons." Nevertheless, this Court has joined a large number of courts in concluding that the First Step Act allows not only the Director of the BOP to consider "other reasons," but also the district court when determining a request for compassionate release brought by an inmate. This Court's reasons for so concluding are thoroughly set forth in its decision in United States v. Duncan, No. 3:11-CR-00012, 2020 WL 4669944, at *3-5 (M.D. Tenn. Aug. 12, 2020). See also United States v. Moore, No. 3:01-CR-00137, 2020 WL 4926601, at *5 (M.D. Tenn. Aug. 21, 2020) (Judge Trauger "reaffirm[ing]" her earlier conclusion that "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release" based upon Duncan and other recent cases).

In addition to there being extraordinary and compelling reasons, the Guidelines provide that

3

compassionate release is only permissible if the defendant "is not a danger to the safety of any other person or the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). In accordance with the statute itself, the Court must also consider the 18 U.S.C. § 3553(a) factors, insofar as they are applicable. 18 U.S.C. § 3582(c)(1)(A)(I).

## II. Application of the Statutory Framework

The parties have taken totally different approaches to the issue before the Court. Reames focuses almost entirely on his underlying medical conditions, specifically his prior two heart attacks, and his present high blood pressure, edema, and obesity. For its part, the Government mostly ignores those conditions and focuses instead on the Section 3553(a) factors and Reames' perceived danger to society were he to be released.

Showcasing one's strong points in a case is hardly surprising because it is natural for a party to put its best foot forward. The problem for Reames, however, is that compassionate release cannot be granted solely on the basis of extraordinary and compelling circumstances. Instead, the Court must also consider both the pertinent Section 3553(a) factors and the potential danger to society. Thus, for example, compassionate release may not be appropriate even in cases of terminal illness. United States v. Kincaid, 802 F. App'x 187, 188 (6th Cir. 2020) (affirming denial of compassionate release where there was "no dispute that [defendant] is not a danger and that her terminal illness constitutes an extraordinary and compelling reason," because the district court determined that the pertinent § 3553(a) factors "weigh[ed] against granting her immediate release"); United States v. Chambliss, 948 F.3d 691, 692 (5th Cir. 2020) (affirming denial of request for compassionate release even though defendant was diagnosed with advanced-staged liver cancer and presented no danger to society because he had served less that half of a 30 year sentence, and releasing him would

4

"minimizes both the impact of [his] crime and seriousness of the offense").

## A. "Extraordinary and Compelling" Reasons

COVID-19's reach and effect is ever-changing. To date more than 2,600 substantive decisions have been issued by the federal district courts discussing COVID-19 and the First Step Act. Although the results vary because every case is fact-driven, present science suggests two constants that should be considered when addressing COVID-19 in the prison environment.

First, COVID-19 is a particularly virulent form of the coronavirus that is easily transmitted from person-to-person. Even those who are asymptomatic can spread the disease. For this reason, the Centers for Disease Control ("CDC") has established guidelines and recommendations to control its spread. This includes washing hands often; avoiding touching one's eye, nose, and mouth with unwashed hands; avoiding close contact with people who may be sick; social distancing (at least 6 feet) when not at home; cleaning and thoroughly disinfecting frequently touched surfaces; and monitoring one's health daily. See, www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick. (all websites last visited September 1, 2020).

Second, there are certain individuals who stand a much better chance than others of becoming extremely sick or even dying if they contract the present strain (SARS-CoV-2) of the coronavirus. The CDC has recognized as much by identifying a number of high risk categories, including older adults, and those with certain underlying medical conditions. Individuals who have cancer, chronic kidney disease, chronic obstructive pulmonary disease (COPD), an immunocompromised state (weakened immune system) from a solid organ transplant, serious heart conditions, sickle cell disease, and type II diabetes mellitus are at increased risk of severe illness or death from COVID-19. www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/. Individuals with moderate to severe

5

asthma, cerebrovascular disease, cystic fibrosis, hypertension (high blood pressure), an immuncompromised state due to certain procedures or diseases, certain neurological conditions, liver disease, pulmonary fibrosis, and type I diabetes mellitus might have an increased risk of severe illness or death. Id.. The CDC recognizes, however, that "COVID-19 is a new disease," and that "there are limited data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19." Id.

Just as it has in most other cases that have been presented to this Court, the Government spends several pages reviewing the Bureau of Prison's efforts to control the spread of COVID-19 in its institutions. While all legitimate efforts to curb the spread are to be applauded, those arguments ring particularly hollow here because Forrest City-Low has already been hit hard with COVID-19. See, United States v. Lavy, No. 17-20033-JAR, 2020 WL 3218110, at *1 (D. Kan. June 15, 2020) ("The BOP reports 692 confirmed cases of COVID-19 at Forrest City Low FCI as of June 15, 2020 – up from 382 confirmed cases as of May 2.'""); United States v. Seymon, No. 11-CR-10040-JES, 2020 WL 2468762, at *1 (C.D. Ill. May 13, 2020) (noting that, as of May 13, 2020, 244 inmates and one staff member at Forrest City-Low had tested positive for COVID-19, but that "the numbers may be greater due to limited testing"). In fact, Reames had the misfortune of contracting COVID-19 while housed at Forrest City-Low. From all outward appearances, however, he appears to have recovered well.

Of course, "the mere presence of COVID-19 in a particular prison cannot justify compassionate release," United States v. Seymon, No. 11-10040, 2020 WL 2468762, at *4 (C.D. Ill. May 13, 2020), otherwise "every inmate in that prison could obtain release," United States v. Calloway, No. 3:16-CR-00121, 2020 WL 3510684, at *2 (M.D. Tenn. June 29, 2020) (citation

omitted). See also, United States v. Williams, No. CR PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) ("The existence of the present pandemic, without more, is not tantamount to a 'get out of jail free' card.'"). Furthermore, Forrest City-Low appears to have somewhat stemmed the tide because, while the BOP has reported that 664 inmates in Forrest City-Low tested positive for COVID-19 since the start of the pandemic, only three inmates and six staff members at that institution had active cases as of the end of August 2020. www.bop.gov/coronavirus/index.jsp. Regardless, it can not simply be assumed that there will be not another tidal wave of cases at that facility.

Nor can it be assumed that Reames will not become reinfected with Covid-19, or that his body's response would be the same were he to become reinfected. As one medical/biotech publication recently observed:

> Researchers are finding that, generally, people who get Covid-19 develop a healthy immune response replete with both antibodies (molecules that can block pathogens from infecting cells) and T cells (which help wipe out the virus). This is what happens after other viral infections.
>
> In addition to fending off the virus the first time, that immune response also creates memories of the virus, should it try to invade a second time. It's thought, then, that people who recover from Covid-19 will typically be protected from another case for some amount of time. With other coronaviruses, protection is thought to last for perhaps a little less than a year to about three years.
>
> But researchers can't tell how long immunity will last with a new pathogen (like SARS-CoV-2) until people start getting reinfected. They also don't know exactly what mechanisms provide protection against Covid-19, nor do they know what levels of antibodies or T cells are required to signal that someone is protected through a blood test. (These are called the "correlates of protection.").

www.statnews.com/2020/08/28/covid-19-reinfection-implications. In short, the science is developing, and the Court cannot say that Reames is now "safe." This is particularly so given his

7

underlying medical conditions.

As noted, the CDC has identified a number of health conditions that can make an individual more likely to suffer severe illness (or even death) as a result of contracting COVID-19, including "serious heart conditions." Such conditions are defined by the CDC as including "heart failure, coronary artery disease, cardiomyopathies, and pulmonary hypertension." Further, other cadiovascular diseases such as high blood pressure, *may* increase the risk of serious illness. www.cdc.gov/coronavirus/2019-cov/need-extra-precautions/people-with-medical-conditions.

The Government argues that "a review of Reames's medical records indicates he does not appear to suffer from any heart condition prescribed by the CDC as putting him at an elevated risk for COVID-19." (Doc. No. 71 at 6). This argument apparently is based upon an affidavit from Maharaj A. Tomar, MD, the Clinical Director of the Forrest City Correctional Complex, in which he states:

> Upon transfer to FCC, Mr. Reames reported a history of cardiac stent placement and old myocardial infarction a few years ago. However, the chart as of August 13, 2020 does not have outside hospital records to verify history above and EKG from last year does not have findings consistent with an old myocardial infarction.

(Doc. No. 71-1 ¶ 7). Leaving aside that there is no indication Dr. Tomar ever examined Reames and the EKG that he references is not in the medical records before the Court as it should be, the suggestions that Reames does not meet the CDC's "increased risk" criteria and he did not have a myocardial infarction, *i.e.* a heart attack, are demonstrably false.

Rule 32(i)(3)(C) requires "that the PSR, accompanied by other Rule 32 determinations, get sent to the BOP," and "together, Rule 32 and the BOP's system work to ensure that the BOP classifies and processes sentenced offenders with the benefit of all relevant and informative

8

sentencing material." United States v. Murchison, 865 F.3d 23, 27 (1st Cir. 2017). Here, the presentence report contained not only Reams's statement about having previously suffered two heart attacks, it also attached an addendum that included a letter from Dr. Evan L. Brittain, a cardiologist at Vanderbilt University Medical, which was intended "to provide a summary of the cardiac history of my patient Terrance Reames." (PSR, Addendum, Brittain letter at 1).

In the letter, Dr. Brittain observed that Reames "has a longstanding history of coronary artery disease dating at least to 2007 when he suffered a myocaridal infarction ('heart attack') and underwent placement of a stent to his left circumflex artery." (Id.). In July 2008, "an echocardiogram demonstrated mildly reduced left ventricular function and evidence of a prior myocardial infarction in the inferior wall." (Id,). In December 2009, a stress test "again demonstrated a prior infarction and showed moderately reduced left ventricular function." (Id.).

Reames was not seen again at Vanderbilt until November 2015 when he complained of chest pain. At that time, a cardiac catheterization "revealed that the previously placed stent was occluded and his left ventricular function was severly depressed." (Id.). However, "because the blockage could [not] be fixed," medical management of "his coronary artery disease" was pursued. The findings from an echocardiogram at the same time suggested "ischemic cardiomyopathy and decompensated heart failure." (Id.). Reames was placed on medications and "discharged several days later without symptoms." (Id.).

Since then, and "with optimal medical therapy, his heart function has improved." (Id.). Indeed, a February 2, 2017 echocardiogram "demonstrated only monderately reduced left ventricular function, resolution of tricuspid regurgitation, and only mild mitral reguritation." (Id.). Reames was last seen by Dr. Brittain on March 3, 2017, and at that time "reported no symptoms related to his

9

heart."  (Id.).

Likely as a result of his coronary artery disease, Reames has some edema (swelling) in his ankles.  He is also obese – standing 5'10" and weighing 250 lbs. – which is another "at risk" factor according to the CDC.

Based upon the CDC's guidelines, Reames is without question in the "at risk" category given his history of coronary artery diseases and obesity.  That coupled with the close confines of a prison environment constitute "extraordinary and compelling reason" for purposes of the compassionate release statute.

**B. Applicable Section 3553(a) Factors and Danger to the Community**

Once again, the Court is presented with a rare case under the First Step Act because the Section 3553(a) factors were not articulated at Reames' sentence.  See, Duncan, 2020 WL 4669944, at *9 (considering the 3553(a) factors for the first time in the context of a request for compassionate release because defendant was subjected to a mandatory life sentence).  Rather, Reames was sentenced to the statutory minimum of 20 years in accordance with the party's binding plea agreement.  Accordingly, the Court considers the relevant Section 3553(a) factors in the context of COVID-19's reality.

   *(1) The nature and circumstances of the offense and the history and characteristics of the defendant*

Reames is 42 years old.  As of the time the PSR was written, both of his parents were living, but both were disabled.  He has two half-brothers, and two-half-sisters.  (Presentence Report ¶ 62).  He was raised primarily by his mother because his father was addicted to crack cocaine.  (Id. ¶ 63).  For an approximately two year period around the time Reames was 12 years old, his mother, too, used cocaine, and during this period he lived with his aunt and grandmother.  (Id.).  His mother "just

10

quit" using drugs, however, and worked at least one job, if not two, to support the family. (Id.).

On February 17, 2017, Reames married Ashley Coachman through which he has a daughter and a stepdaughter, both of whom reside with their mother in Phoenix, Arizona. In addition to those two children, Reames has two daughters and one son from prior relationships. (Id. ¶¶ 64-67).

Ms. Coachman works as an underwriter for Quicken Loans, and it is proposed that Reames would live with his wife and daughters in Phoenix. Ms. Coachman would also add Reames to her Blue Cross/Blue Shield policy were he to be released. (Doc. No. 72-4 at 1).

Reames has a lengthy history of substance abuse. By his own report, he began drinking alcohol and smoking marijuana daily at the age of 12 and that use continued until he was approximately 37 years old. At age 14, he began using cocaine daily, and did so for the next five or six years. In 1999 at the age of 20, Reames began daily use of opiates such as oxydodone and percocet, and that use continued until 2017. In 2013, he used molly daily for the next three years. Finally, beginning in 2017 and ending in 2018 when Reames was 38 to 39 years old, he used amphetamines, such as adderall and vyvanse, daily. (PSR ¶ 77).

Reames' involvement with drugs led him to be expelled from Hunter's Lane High School in Nashville, Tennessee for possession of marijuana. (Id.).[1] It also lead him to being shot in the shoulder when he was 14 while selling crack cocaine. Reames was also shot on three other occasions: (1) he was struck by a stray bullet in the back of his leg when he was 11; (2) he was struck again by a stray bullet in the leg when he was 28; and (3) he was shot in the lower back in 2008 when someone tried to rob him while he was selling shoes from his vehicle. (Id. ¶¶ 68, 70, 73).

---

[1] Reames subsequently obtained his generally equivalency diploma (GED) in 1996. He enrolled in the culinary arts program at Atlanta Technical College, but apparently was "kicked out" after a .22 caliber pistol fell out of his backpack at school. (Id. ¶ 80).

11

Reames also has a history of drug offenses, not counting the ones that resulted in his present incarceration. At the age of 22, he was convicted for possessing or the casual exchange of two "rocks" of cocaine (that had been reduced from a distribution charge), and was given a suspended 11 month, 29 day sentence with the condition that he complete drug and alcohol treatment. (Id. ¶ 39). Two years latter he was convicted of possessing under .5 grams of cocaine for resale, which was again a reduce charge in exchange for a guilty plea. (Id. ¶ 40). Three years after that, he was convicted of unlawful use of drug paraphenalia, even though he was originally also charged with possessing with intent to distribute amphetamines and methamphetamines, as well as felony possession of a weapon. (Id. ¶ 41). On January 20, 2012, Reames plead guilty to another charge of possession or casual exchange of narcotics and, at the time of his arrest on that charge was found to be in possession of $5,342 in various denominations. (Id. ¶ 43). Finally, Reames was convicted of possessing less than an ounce of marijuana on December 20, 2012, while he was incarcerated in the Clayton County Correction Facility in Jonesboro, Georgia on a driving while suspended charge. (Id. ¶ 44).[2]

As for the nature and circumstances of the present offenses, the facts are set forth in detail in the Presentence Report at paragraphs 8 through 16, as well as in an addendum to the Plea Agreement. The following brief summary of those facts to which Reames agreed show a years-long sophisticated and profitable criminal enterprise.

Methylone and ethylone are Schedule I controlled substances. Those substances are similar to Ecstacy/MDMA in structure and effect, and commonly referred to in the streets as molly.

---

[2] In addition to those convictions, Reames was charged on July 21, 2016, with possessing with the intent to distribute 140 pounds of marijuana that was found in a crate that had been shipped from Phoenix to Nashville. Those charges were eventually dropped. (Id. 60).

On or before May, 2011, Reames became aware of a molly supplier in China known as "Alice." Thereafter and through August 2014, Reames communicated with Alice using his email account in order to obtain molly for distribution in Nashville and parts of Georgia. During the latter portion of this endeavor, Alice used encryption software in an effort to avoid detection by law enforcement.

Within the time-frame covered by the Indictment, Reames repeatedly obtained kilogram quantities of methylone. Each kilogram could be broken down into approximately 1,000 capsules of molly.[3] Then, in January 2014, he also began buying and receiving ethylone from China at a cost of $2,200 per kilogram, including shipping. Reames or one of his designees[4] received the molly, either through the United States mail, or through international shipping companies. The packages were falsely labeled in order to prevent detection by the authorities.

Reames obtained a total of approximately 100-120 kilograms of methylone and ethylone from Alice. He used profits from earlier sales to reinvest in more molly, or would have others send the drug proceeds to Alice and receive the drug parcels from her. This helped to conceal his own involvement and to disguise the nature, source, control, and ownership of the drug proceeds.

At the time Reames began his enterprise, molly was relatively unknown in Nashville, although it had already begun to gain popularity in the Atlanta area where Reames generally lived. Thus, Reames decided to introduce and market molly in Nashville by meeting with various individuals, informing them that molly was similar to Ecstasy/MDMA, and assuring them that he

---

[3] Reames would pay others with either molly or cash to breakdown the kilograms into capsules.

[4] For example, Reames had packages containing molly shipped to an aunt, originally telling her that they contained nutritional supplements or hair weave.

could provide molly to them at a low price. Thereafter, molly became widely available in Nashville and Reames was a substantial distributor.

Email, bank and wire transfer records show that, from May 2011through January 2014, approximately $275,000 was transferred by Reames and those acting on his behalf to various nominees in China. That amount of money equates to payment for approximately 120 kilos of methylone and ethylone.

During this criminal enterprise, Reames had multiple firearms at his residence, including AR-style rifles, handguns, and a sawed-off shotgun as protection from drug-related robberies. The firearms also served to protect drug related assets, including jewelry that Reames claimed to be worth well over $150,000, and cash drug proceeds that Reames had in the residence. As a result of his criminal activity, Reames obtained substantial income and resources, including drugs with a wholesale/kilogram value of much more than $1,000,000.

### 2. *The need for the sentence imposed*

The "need for the sentence imposed" factor is intended to "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). In this case, all of these considerations cried out for a very long prison sentence.

As noted, Reames was responsible for importing around 100 to 110 kilograms of methylone and ethylone. To place that amount into perspective, it is the marijuana equivalent of 50,000 to 55,000 kilograms. Further, the criminal enterprise spanned several years and involved five or more

14

individuals over whom Reames was the organizer or leader. His efforts helped boost molly's popularity in Nashville, which alone is troubling. Moreover, this was not Reames' first foray into the drug world. He has used a large number of drugs in the past, and has several prior drug convictions. The need for general and specific deterrence are both very strong in this case.

### 3. *The kinds of sentences available and the guideline range*

As noted, Count One required a mandatory minimum sentence of 20 years, which is exactly what Reames received. In this regard he was fortunate. The Guidelines called for a 360 month to life term of imprisonment based upon an offense level 43,[5] and a criminal history category III.

The Court recognizes Reames' argument that the 20-year minimum sentence was a result of a charging decision by the Government. That is, "the government could have simply charged Mr. Reames with a drug trafficking conspiracy and sought the Guideline enhancement for 'leader or organizer,'" in which case he "may well have been in a position to argue for a sentence shorter than 20 years[.]" (Doc. No. 72 at 8). Maybe so, but the decision on which charge to bring rests with the prosecutor. While "the breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse," Bordenkircher v. Hayes, 434 U.S. 357, 365 (1978), there is no suggestion of that here. Moreover, even if the Government had chosen not to bring a continuing criminal enterprise charge, the Court cannot say that Reames' sentence would have been below the twenty years that was imposed. In fact, it might have been higher in light of the offense conduct, his personal history, the need for deterrence, and the recommended guideline range.

---

[5] Actually, Reames' adjusted offense level was 50, but the Guidelines are capped at 43.

#### *4. The need to provide medical care in the most effective manner*

The Court has already discussed Reames' pertinent medical history. For purposes of this Section 3353(a) factor, however, a couple of additional observations are warranted. First, Reames argues that his "medical records demonstrate the complete failure of the BOP to provide the cardiac care recommended by Dr. Brittain." (Doc. No. 63 at 7-8). This overstates Dr. Brittain's letter. What Dr. Brittain actually stated was that he strongly recommended that Reames "stay on his current cardiac treatment regimen," and that he "would like to see him every 6 months to monitor for any change in his symptoms." (PSR, Brittain Letter at 2). The regimen is not specified, and Dr. Brittain's ability to see Reames became an impossibility when Reames was arrested some three months after his last visit with Dr. Brittain.

In any event, "[i]nmates have a constitutional right to adequate medical care, [but] they do not have a right to optimal medical care or to the doctors of their choice." United States v. Dimasi, 220 F. Supp. 3d 173, 177 (D. Mass. 2016). In this regard, the prison records reflect – and Reames concedes – that he is prescribed "four medication specifically to treat his hypertension: Arvedilol, Losartan potassium, potassium chloride, and aspirin." (Doc. No. 72 at 3). He has also been prescribed diuretics, including Lasix and Furosemide, to treat his edema. (Doc. No. 61 at 14, 23).

Second, Reames heart attack occurred in 2006, long before the continuing criminal enterprise involving molly started. Even when he was hospitalized for several days because of chest pain in November 2015, he continued with his criminal enterprise. In short, Reames' health conditions did not serve as a deterrent to criminal drug activity.

Third, and as previously noted, the infection rate for COVID-19 at Forrest City-Low appears to have ebbed. At the same time, the infection rate for Phoenix where Reames intends to reside has

16

risen, with Maripoca County (where Phoenix is the county seat) reporting 133,391 COVID-19 total and 247 new cases on August 30, 2020. www.maricopa.gov/5460/Coronavirus-Disease-2019. This begs the question of whether Reames would truly be better off in Phoenix in terms of the potential for reinfection.

### 5. *Danger to others or the community*

In addition to the Section 3553(a) factors, a court reviewing a request for compassionate release must consider whether the defendant poses a danger to other persons or the community under 18 U.S.C. § 3142(g). Thus, "even where an individual has medical conditions which make him vulnerable to COVID-19, the individual's danger to the community may ultimately outweigh any health concerns and the balance of factors would weigh against release." United States v. Belle, No. 3:18-CR-117-(VAB)-1, 2020 WL 2129412, at *5 (D. Conn. May 5, 2020).

"To be sure, drug trafficking is a serious offense that, in itself, poses a danger to the community." United States v. Stone, 608 F.3d 939, 947 n. 6 (6th Cir. 2010); see also, United States v. Gilliard, 722 F. App'x 818, 821 (10th Cir. 2018) (noting that danger to the community is broader than violence and "so the threat of continued drug trafficking can constitute a danger to the community"). While Reames has not been in the drug trafficking business since he has been incarcerated, the Court has no assurance that he would not resume that activity were he to be released now, even under the condition of home confinement. Notably, a great deal of his prior drug activity was done on online, with large and repeated shipments of methylone and ethylone in the mail or by parcel delivery services.

### IV. Conclusion

District courts have "broad discretion to determine what sentence will serve [§ 3553(a)'s]

17

statutory objectives." United States v. Kontrol, 554 F.3d 1089, 1093 (6th Cir. 2009). In exercising that discretion, "courts routinely weigh whether a certain amount of time is 'sufficient, but not greater than necessary,' to serve § 3553(a)'s purposes," and "may use that same calculus when deciding whether to grant a motion for compassionate release." United States v. Kincaid, 805 F. App'x 394, 395–96 (6th Cir. 2020). Even factoring Reames' medical conditions and the existence of COVID-19 into the equation, the Court cannot conclude that the thirty-eight months he has spent in prison since his arrest on June 26, 2017 is "sufficient, but not greater than necessary, to comply with . . . the need for 'just punishment, deterrence, protection of the public, and rehabilitation.'" Holguin-Hernandez v. United States, 140 S. Ct. 762, 765–66 (2020) (internal emphasis and citation omitted).

Accordingly, his Supplemental Motion for Compassionate Release (Doc. No. 63) will be denied.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE